UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America *ex rel.* Gwendolyn Moore, <br>     *Plaintiff,* <br><br>       *v.* <br><br> Community Health Services, Inc., Michael Sherman, <br> and Dan Clemons, <br>     *Defendants.* | Civil No. 3:09cv1127 (JBA) <br><br><br> March 29, 2012 |

RULING ON MOTIONS TO DISMISS

On July 1, 2011, Relator Gwendolyn Moore filed a Second Amended Complaint [Doc. # 52] against Defendants Community Health Services, Inc. ("CHS"), CHS Chief Executive Officer Michael Sherman, and CHS Chief Financial Officer Dan Clemons, bringing a *qui tam* proceeding for making false statements and submitting false claims to the Department of Health and Human Services ("DHHS") and the United States Government in CHS's billings for Medicare and Medicaid, in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* Moore also brings a claim for retaliation in violation of the anti–retaliation provision of the FCA, 31 U.S.C. § 3730(h). CHS moves [Doc. # 54] to dismiss the Second Amended Complaint, as do Defendants Sherman and Clemons [Doc. # 56]. For the reasons that follow, Defendants' motions will be granted in part and denied in part.

I.      Factual Allegations

Ms. Moore alleges in her Second Amended Complaint that Defendants "engaged in a concerted effort and scheme to maximize reimbursement from . . . Medicare and Medicaid" by submitting billings to both programs "that were supposed to reflect the care that was rendered as well as the individual who rendered it," but instead "constituted false

claims under the False Claims Act because the Defendants knew that the claims were not reimbursable—for the amounts being claimed or for the treatments being claimed—under the rules and regulations governing these programs." (2d Am. Compl. ¶¶ 35–37.)

CHS is a Federally Qualified Health Care ("FQHC") facility that operates as a community health center, providing healthcare services to almost 16,000 individuals and accommodating over 60,000 patient visits per year. (*Id.* ¶ 4.) It receives Medicare and Medicaid funding from the United States Government. (*Id.*) Relator Moore began working for CHS in 2001, and during the time period relevant to her allegations, served as Medical Billing Manager for CHS. (*Id.* ¶ 3.) As Medical Billing Manager, she "monitored aging accounts, created detailed reports for month end closing and balancing, and engaged in intake staff training and updating systems modules with procedures and diagnosis codes." (*Id.*) She was also "involved in the quarterly reporting for the Medicare Credit Balance report as well as in . . . tracking flu shots for the Medicare Cost report," and "monitor[ed] . . . Medicare and Medicaid billings and electronic postings." (*Id.*) She alleges that Defendants Sherman and Clemons "were instrumental in controlling the financial operations and billing services of the Defendant CHS, individually, and as the agents, servants and employees of CHS," and that they "certified to the United States Government . . . that they were following the stringent rules and requirements mandated by the Federal Government to qualify for the receipt of Federal funds under the Medicare and Medicaid programs." (*Id.* ¶¶ 38–39.)

Ms. Moore alleges that Defendants "established a system that maximized the receipt of funds from the United States to which CHS was not entitled . . . [and] implemented, fostered and tolerated an atmosphere of corruption, where the Relator Gwendolyn Moore,

as Manager of Medical Billing, was directed by the Defendants to submit these billings to the United States Government under constant pressure and intimidation if she did not do so." (*Id.* ¶¶ 40–41.) She also alleges that she "was kept silent with threats of immediate termination in the event she did not comply with the Defendants' directions to follow through and implement these schemes involving the submission of False Claims." (*Id.* ¶ 42.)

In Count One of her Second Amended Complaint, Ms. Moore alleges that Defendants Sherman and Clemons, as agents, servants and/or employees of CHS, "rather than submitting the names of the actual providers, practitioners, clinicians, and the nurse practitioners etc. who actually had the face–to–face encounter with, and actually treated, the patients, routinely ordered [her] and CHS employees involved in billing to put the code for doctors[] and physicians who didn't see or treat the patient on claims for payment forms that were filed with the Government." (*Id.* ¶ 49.) She further alleges that Sherman and Clemons directed "the system" to "convert all claims to a 99212," which is the official code given for an office or outpatient visit that includes a face–to–face encounter with a physician, "regardless of the service that was provided." (*Id.* ¶¶ 51–67, 71–73.) Ms. Moore claims that this was done "to be sure that CHS would be paid at the highest rate for every service that was provided at CHS." (*Id.* ¶ 67.) "Nurses and clinicians routinely saw patients with no specialist in the medical specialty being present, or 'on site,' and these visits, on orders from Sherman and Clemons through the billing system that they implemented at IT, all were upcoded and billed with the names of the licensed physicians." (*Id.* ¶ 51.)

Ms. Moore alleges that claims were submitted for payment "with the names of practitioners who were not 'on site,' who no longer were working for CHS, or were working just one or two days per week, and thus rendered no 'face–to–face' service to the patients,

nor were they present at the facility to supervise the treatment." (*Id.* ¶ 55.) She further alleges that she and her billing staff were, "on a daily basis," forced by Sherman and Clemons "to bill every encounter as a 99212, and this practice resulted in bills being submitted to Medicare and Medicaid with the names of licensed physicians who never saw the patient." (*Id.* ¶ 56.) According to Moore, Drs. Gretchen Allen, Marela Popa, Gene Jarda, Sayed Ali "had their names placed on bills, with CHS falsely claiming them to be the treating practitioner with the face–to–face encounter with the patient," despite the fact that clinicians, such as Marva Beckford, Marcolina Garcia, George Dillon, Dorian Parker, Amy Taylor, and Harry Womack actually provided the services for which the bills were submitted. (*Id.* ¶¶ 57–67.)

Ms. Moore alleges that she "told Sherman and Clemons that these billings were illegal and not proper, but Sherman and Clemons didn't listen, and the bills continued to go out, and CHS kept on receiving payments for the United States Government." (*Id.* ¶ 68.) "[T]he Government paid CHS at the higher doctor's rates for 'treatments,' and this was accomplished by placing the names of doctors on bills who in fact never saw, treated, or had an 'encounter' with the patients, patients who instead were seen by nurse practitioners, clinicians, physicians' assistants, clinical psychologists, dental assistants, licensed clinical social workers or persons who never even had an official title in the medical care profession." (*Id.* ¶ 69.)

In Count Two of the Second Amended Complaint, Ms. Moore incorporates the allegations discussed above, and further alleges that "[u]nlicensed or uncredentialed providers routinely saw patients, while CHS, on order from Sherman and Clemons, billed these services with credentialed doctors' names placed on the bills processed for payment

to the Government." (*Id.* ¶¶ 71–75.) She alleges that unlicensed or uncredentialed providers Dorian Parker, Amy Taylor, and Harry Womack saw and treated patients and billed under Doctor Jarda's name; unlicensed psychiatrist Dr. Volpe billed under Dr. Jarda's name; unlicensed physician Jovanne Claybourne billed under Shaheena Shan's name; and Drs. Karen Fiesland and David Parker, who had not submitted credentialing applications "for one to two years" billed under the name of Dr. Gretchen Allen. (*Id.* ¶¶ 76–80.)

In Count Three, Ms. Moore alleges that Defendants routinely falsified information in applying for federal grants. (*Id.* ¶¶ 83–86.) She alleges that Clemons certified that he had a degree in finance—as required by the grants—which he did not have; that CHS's COO and resource director had only a high school diploma, although the Government required her to have college experience; and that the head of Human Relations, Velma Razor, had only a high school diploma, although she was required to have some college experience. (*Id.* ¶¶ 87–89.) According to Ms. Moore, "[a]ll of these persons lied on the 330 Grant Application to the Federal Government." (*Id.* ¶ 91.)

In addition, "[i]n order to obtain the Federal funding grants, CHS was required to certify that patients receiving treatment at CHS would be billed and would pay for these visits and treatments on the sliding fee scale mandated by the U.S. Government," however Defendants directed Ms. Moore not to follow this sliding fee scale, and instead CHS "never used, or very rarely used, the sliding fee scale when it came to billing patients for treatments that were expensive, and virtually all patients were billed at the same maximum rate." (*Id.* ¶¶ 92–107.) "These flat rates were 'sold' to patients as a bargain . . . when in fact the charge they should have been charged would have been significantly lower had the sliding fee scale been used." (*Id.* ¶ 108.) Ms. Moore alleges that "the Defendants with their false certification

5

of compliance with the terms and conditions of the Federal Grant as an FQHC, obtained funding from the Government amounting to millions of dollars annually, while at the same time realizing a profit with the unauthorized overcharges on each and every bill where the sliding fee scale reductions should have been imposed." (*Id.* ¶ 109.)

In Count Five,[1] Ms. Moore alleges that she "complained to CHS management about" the fraudulent billing practices described in her preceding allegations, and was thereafter insulted, threatened with termination, subject to "severe and unrelenting verbal abuse in private meetings and in general staff meetings, with constant yelling and threats of termination if [she] refused to follow the orders from Clemons and Sherman," and otherwise harassed. (*Id.* ¶¶ 112–14.) At an April 15, 2009 meeting with Clemons, Sherman, and "the Auditor," Ms. Moore informed the men "that the number was 'still short $200,000,'" and Sherman responded by looking at Ms. Moore and telling the auditor "If you can make the number go away, we will let you have Gwen in return." (*Id.* ¶ 115–16.) Sherman also, in response to a comment made "about moving the billing office to such an open place," told everyone at a general staff meeting "that Gwendolyn Moore was . . . 'the dumb son of a bitch who chose that spot for billing.'" (*Id.* ¶ 117.)

Ms. Moore further alleges that after she "went to Human Resources regarding the severe credentialing problems," the allegations regarding which are discussed above, Sherman met with her and described her complaints to Human Resources as "personal attacks." (*Id.* ¶¶ 121–23.) She also alleges that Sherman and Clemons used the "promotion and advancement policies at CHS . . . as a means of retaliation and harassment"; she claims that they hid from her "a new Director position" because she had filed complaints with

---

[1] Relator has withdrawn Count Four.

Human Resources regarding the credentialing. (*Id.* ¶¶ 125–28.)  According to Ms. Moore, she "was constantly threatened with 'Fix this or you're fired.  If this is not fixed, your entire staff is fired.' And 'You better do whatever it takes.  If I do not see the revenue, I will fire you.'" (*Id.* ¶ 131.)

As a result of the pressure from Sherman and Clemons, Ms. Moore alleges that she "suffered from major stress," and became ill and was placed on medical leave due to high blood pressure, heart palpitations, tremors, and blurred vision.  (*Id.* ¶ 132.)  She alleges that "[w]hile out on medical leave in Spring of 2010, [she] was terminated."  (*Id.* ¶ 133.)

II.     Discussion[2]

A.     Count One

Defendants argue that the "upcoding" claim in Count One fails to state a claim for relief that is plausible on its face because 1) the use of code 99212 is not exclusively limited to describing physician services but can be used for any office or outpatient visit for evaluation and management of an established patient, and 2) there could not have been a wrongful disbursement of money in violation of the FCA because CHS gets paid the same rate for each Medicare or Medicaid covered visit regardless of whether the patient is seen by

---

[2] The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and  a defendant may move to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Fed R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kuck v. Danaher*, 600 F.3d 159, 162–63 (2d Cir. 2010).  A complaint will not survive a motion to dismiss if it relies on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or if "the well–pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 129 S. Ct. at 1949–50.

a physician or any other core provider.  Ms. Moore does not dispute that 99212 encounters were billed at the same rate as would any other core provider encounter,[3] but argues that "[t]he untruthful reporting of doctors costs' is the central theme" behind her allegations and that by falsely reporting every encounter as a 99212, Defendants inflated the figures that played a role in the Government's determination of the fixed encounter rate to be paid to CHS for the following year.  (Opp'n [Doc. # 57] at 30–32.)  Defendants counter in their Reply, and Defendants' counsel claimed at oral argument, that this is a new theory of liability that is found nowhere in the Second Amended Complaint, and nonetheless fails to state a claim upon which relief can be granted because the use of code 99212 still does not relate to the cost figures reported to the Government.

Ms. Moore's false claims counts against Defendants straddle the 2009 Fraud Enforcement and Recovery Act ("FERA"), effective May 20, 2009, which amended the FCA at 31 U.S.C. §§ 3729(a)(1) and (a)(2).  Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621–22 (2009).  FERA renumbered §§ 3729(a)(1) and (a)(2) as §§ 3729(a)(1)(A) and (a)(1)(B), respectively, and made the amendment to § 3729(a)(2), but not § 3729(a)(1), retroactive to claims pending on or after June 7, 2008. *Id.*; *see United States ex. rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, — U.S. —, 131 S. Ct. 1885 (2011).  Because of this split in retroactivity, and because Ms. Moore stopped actively working at CHS in April 2009,[4] prior

---

[3] At oral argument, Ms. Moore's counsel agreed that the 99212 code is billed at the same rate as any other covered visit.

[4] Ms. Moore alleges in her Second Amended Complaint that she was placed on medical leave because of stress, high blood pressure, heart palpitations, tremors, and blurred vision as a result of the threats and harassment in retaliation for her complaints about CHS's

to the passage of FERA, the former pre–FERA § 3729(a)(1) and the current post–FERA § 3729(a)(1)(B) both apply to her false claims counts.

To state a claim under the pre–FERA Section 3729(a)(1) of the FCA, a plaintiff must allege that a defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001) (citing 31 U.S.C. § 3729(a)). Under the post–FERA Section 3729(a)(1)(B) of the FCA, a plaintiff must allege that a defendant "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). A false or fraudulent claim is a claim "aimed at extracting money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696. The false, fraudulent, or wrongful activity must be linked "to the government's decision to pay." *Id.*

Ms. Moore acknowledges that FQHCs "get paid the same rate regardless of the type of covered service provided to the patient or the type of health professional who has the face–to–face visit with the patient." (Opp'n at 19.) However, Ms. Moore argues that "the falsification of the billing codes does matter, because the bills that were certified as being accurate and true were used to determine the next all–inclusive rate that was put together by the fiscal intermediaries." (*Id.* at 34.) Her counsel reiterated at oral argument that lack of difference among the payment rates for different billing codes notwithstanding, fiscal

---

billing practices and that she was terminated in the spring of 2010 while on medical leave. (2d Am. Compl. ¶¶ 132–133.) Defendants state that she went on medical leave and stopped actively working at CHS in April 2009. Ms. Moore argues that the timing of her medical leave does not affect the applicability of the FERA amendments to her claims, but she does not dispute that she stopped actively working in April 2009.

intermediaries take into account the frequency with which a FQHC bills the 99212 code in establishing the flat rate at which that FQHC will be compensated.

The intermediaries to which Ms. Moore refers, according to the Healthcare Benefits Policy Manual § 405.2464, adjust the rate paid to a FQHC based on the cost reports submitted by the FQHC: "The [all–inclusive] rate is determined by dividing the estimated total allowable costs by estimated total visits for rural health clinic or Federally qualified health center services." 42 C.F.R. § 405.2464(a)(2). This all–inclusive rate is "subject to reconciliation to assure that those payments do not exceed or fall short of the allowable costs attributable to covered services furnished to Medicare beneficiaries," which is calculated by the intermediaries by calculating the average cost per visit "by dividing the total allowable cost incurred for the reporting period by total visits," then "multiplying the average cost per visit by the number of visits for . . . Federally qualified health center services by beneficiaries" to reach the total cost of FQHC services. *Id.* § 405.2466. The Second Amended Complaint does not contain any factual allegations as to figures reported in cost reports or the total allowable cost reported by CHS, and alleges only that CHS, at Sherman's and Clemons' direction, used the 99212 billing code for encounters that did not involve physicians. Having conceded that neither the billing code nor the type of personnel participating in the patient encounter affects CHS's reimbursement, without any allegation that CHS falsified figures in its cost reports, the Second Amended Complaint does not allege that CHS took any meaningful steps to manipulate the all–inclusive rate determined by the intermediaries. The Second Amended Complaint accordingly does not put forth a viable claim that CHS extracted "money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696. Count One therefore fails to state a claim upon which relief can be granted.

B.      Count Two

Defendants argue that Count Two, alleging that CHS billed services provided by uncredentialed providers as being provided by credentialed providers, fails to state a claim upon which relief can be granted because the law does not require providers to be individually credentialed by Medicaid or Medicare.  In response, Ms. Moore does not argue that CHS was required to use only credentialed providers for patient encounters, but instead argues, relying on Medicare Advantage Program regulations, that the HMOs used by CHS required the providers to be credentialed.

The regulation cited by Ms. Moore, 42 C.F.R. § 422.204(b)(2)(iii), states that Medicare Advantage organizations must "follow a documented process," which for members of physician groups includes "[a] process for consulting with contracting health care professionals with respect to criteria for credentialing and recredentialing." Ms. Moore does not allege in her Second Amended Complaint, however, that CHS participated in the Medicare Advantage Program; Count Two refers only to Medicaid HMOs.  Ms. Moore's counsel agreed at oral argument that there are no Medicare Advantage Program allegations in the Second Amended Complaint.

The relevant portion of the Medicaid managed care regulations, 42 C.F.R. § 438.214(b)(2), states: "Each MCO, PIHP, and PAHP must follow a documented process for credentialing and recredentialing of providers who have signed contracts or participation agreements with the MCO, PIHP, or PAHP."  While this regulation imposes credentialing requirements on the managed care organization with respect to the providers that it enrolls, it does not impose any credentialing requirements on the FQHC itself.  Given that CHS was not required by any regulation to provide care using only credentialed physicians, Count

11

Two does not allege any activity by Defendants in which CHS falsely or fraudulently reported any information that bore on the Government's decision to pay CHS. *See Mikes*, 274 F.3d at 695–96. Count Two therefore fails to state a claim upon which relief can be granted.

      C.     Count Three

Defendants argue that Count Three, alleging that CHS falsely certified compliance with sliding fee scale requirements,[5] fails to state a claim upon which relief can be granted because the federal sliding fee scale regulations require only that "full or near full discounts be given to patients below the poverty line, prohibit discounts for patients whose incomes exceed the poverty line by two times, and require waiver of fees for any patients unable to pay them," and Ms. Moore does not allege that they violated any of these requirements. (CHS Mem. Supp. [Doc. # 54] at 22.) Ms. Moore responds that in her Second Amended Complaint she "describes the details of how the Defendant intentionally distorted the application of the sliding fee scale" and that "because of the manner in which the sliding fee scale was distorted, the prices were raised exponentially above the rate that should and would have been charged had the sliding fee scale been appropriately applied." (Opp'n at 39.) She argues that these actions inflated the receivable numbers, "gave false representations as to the services that were being written off for the year," and "fraudulently helped pump up the numbers that went into the flat rate, making CHS look like it was providing more services for free than it actually was." (*Id.*)

---

[5] Ms. Moore has withdrawn the portion of Count Three having to do with the qualifications of personnel. (*See* Opp'n at 3–4.)

The statutory provision governing grant applications by primary care health centers states that to be approved for a grant, a health center must prepare a "schedule of discounts to be applied to the payment of . . . fees or payments, which discounts are adjusted on the basis of the patient's ability to pay." 42 U.S.C. § 254b(k)(3)(G)(i).  The health center must also "assure that no patient will be denied health care services due to an individual's inability to pay for such services . . . [and] assure that any fees or payments required by the center for such services will be reduced or waived to enable the center to fulfill [that] assurance." *Id.* § 254b(k)(3)(G)(iii).  The relevant regulation provides that a health center must:

> Have prepared a schedule of fees or payments for the provision of its services designed to cover its reasonable costs of operation and a corresponding schedule of discounts adjusted on the basis of the patient's ability to pay. Provided, That such schedule of discounts shall provide for a full discount to individuals and families with annual incomes at or below those set forth in the most recent CSA Poverty Income Guidelines (45 CFR 1060.2) and for no discount to individuals and families with annual incomes greater than twice those set forth in such Guidelines, except that nominal fees for services may be collected from individuals with annual incomes at or below such levels where imposition of such fees is consistent with project goals.

42 C.F.R. § 51c.303(f).

The above statutory provisions and regulation require a health center to establish a sliding fee schedule of discounts based on patients' ability to pay, and forbid a health center from denying care based on a patient's inability to pay.  Although Ms. Moore alleges that CHS did not follow its established fee scale and instead billed at a maximum fixed rate, she does not allege that CHS did not prepare a fee schedule as required, or that CHS ever turned away patients based on their inability to pay the fixed rate she alleges it was using.  She has therefore failed to allege that CHS violated any of the sliding fee scale requirements under federal law.  Count Three accordingly fails to state a claim upon which relief can be granted.

D.     Count Five

In Count Five of the Second Amended Complaint, Ms. Moore alleges that Defendants CHS, Clemons, and Sherman verbally harassed her, hid promotional opportunities from her, threatened her, and ultimately fired her in retaliation for her complaints about the CHS billing practices that she perceived as fraudulent, all in violation of the FCA retaliation provision, 31 U.S.C. § 3730(h).  Defendants argue that Ms. Moore fails to state a claim for retaliation upon which relief can be granted because she does not allege that she was engaged in conduct protected under the FCA, fails to allege facts sufficient to establish that CHS knew she was investigating fraud, and fails to allege facts sufficient to establish an inference of causation between her activity and adverse employment action.  Ms. Moore argues in response that Defendants apply the wrong legal standard to their motion to dismiss the retaliation claim; that FERA applies to Count Five and under FERA in order to state a claim for retaliation she need only allege that she engaged in "lawful acts . . . to stop 1 or more violations" of the FCA.  (Opp'n at 26–30.)

The retaliatory acts alleged by Ms. Moore in Count Five straddle the May 20, 2009 FERA amendments to the FCA.  As Ms. Moore went on medical leave in April 2009, the verbal harassment, threats, and other actions taken by Mr. Clemons and Mr. Sherman while she was at CHS must have occurred prior to May 20, 2009, but her termination occurred after that point, in the spring of 2010.  Under the pre–FERA standard, to sustain a retaliation action under Section 3730(h) of the FCA, Ms. Moore must prove "(1) that [she] engaged in conduct protected under the statute, (2) that defendants were aware of [her] conduct, and (3) that [she] was terminated in retaliation for [her] conduct." *United States ex. rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006).

14

Under the amended statute, Ms. Moore must prove that she was "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations" of the FCA.  31 U.S.C. § 3730(h)(1).

Although neither the Second Circuit nor any of the district courts within it have yet taken up the issue of whether the change in language meaningfully alters a plaintiff's burden in maintaining a retaliation action under the FCA, other courts have continued to apply pre–FERA standards similar to that in *Sarafoglou* to actions governed by the post–FERA § 3730(h)(1).  *See, e.g., United States ex. rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08–CV00114, 2012 WL 628515, *10 (S.D. Ohio Feb. 27, 2012) (finding that for a plaintiff to establish retaliation in violation of the post–FERA § 3730(h)(1) "he must prove: (1) he was engaged in a protected activity; (2) the employer knew about the protected activity; and (3) the employer must have discharged or otherwise discriminated against the alleged whistleblower as a result of the protected activity"); *Jewell v. Lincare, Inc.*, 810 F. Supp. 2d 340, 343 (finding that to establish a prima facie retaliation claim in violation of the post–FERA § 3730(h)(1), "a plaintiff must show that (1) he engaged in 'protected conduct,' (2) the employer knew that the employee was engaged in such conduct and (3) the employee was discharged 'because of' that protected conduct").

To prove that she engaged in conduct protected under the statute, Ms. Moore need not prevail on her underlying FCA claims, but only demonstrate that she "had been investigating matters that were calculated, or reasonably could have [led], to a viable FCA action." *United States ex. rel. Sasaki v. N.Y. Univ. Med. Ctr.*, No. 05 Civ. 6163 (LMM) (HBP),

2012 WL 220219, *12 (S.D.N.Y. Jan 25, 2012). She must be able "to show a 'good faith basis', or 'objectively reasonable basis', for believing that . . . she was investigating matters in support of a viable FCA case." *Id.* (citing *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008); *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006)). The FCA's anti–retaliation provision does not "prevent employers from discharging workers who enter fantastic realms." *Lang*, 472 F.3d at 495 (affirming summary judgment for employer on Section 3730(h) retaliation claim where employee lost her job after telling the FBI that executives at her company were lying to the Federal Reserve "on no basis other than rumor that someone must be 'cooking the books'"). Instead, conduct is protected under the anti–retaliation statute "when a potential plaintiff engages in an investigation in which it would be reasonable to conclude that there is a 'distinct possibility' that he or she would find evidence of an FCA violation." *United States ex. rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 103–04 (D. Conn. 2006) (relator's allegations "that he was investigating and reporting defendant's alleged fraudulent billing practices" were sufficient to satisfy the first prong of the Section 3730(h) inquiry on a motion to dismiss).

Ms. Moore alleges in her Second Amended Complaint that she was investigating and complained to CHS management, including Clemons and Sherman, about what she perceived as fraudulent billing practices. (2d Am. Compl. ¶¶ 112–14.) She further alleges that her complaints regarding the practices she outlines in the Second Amended Complaint were met with "severe and unrelenting verbal abuse," including taunts, threatened termination, and insults. (*Id.* ¶¶ 112–17.) She has therefore alleged facts that plausibly support claims that she had been investigating practices that reasonably could have led to a viable FCA action and that CHS, Sheman, and Clemons were aware of her investigation.

Ms. Moore has also alleged facts that could give rise to an inference that she was discriminated against and terminated in retaliation for her actions in response to fraudulent activity she perceived.  She claims that after complaining to CHS management she was subject to harassment and verbal abuse, that Sherman and Clemons hid a promotional opportunity from her, and that while on medical leave she was terminated.  (*Id.* ¶¶ 112–33.) Ms. Moore has therefore stated a claim for retaliation that is plausible on its face.

With respect to her retaliation claims against Defendants Sherman and Clemons, the pre–FERA version of Section 3730(h) allowed for recovery by an employee "who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms or conditions of employment by his or her *employer*." 31 U.S.C. 3730(h) (2009) (emphasis added).  Courts interpreting this statutory provision have held that "the word 'employer' does not normally apply to a supervisor in his individual capacity." *Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001) (collecting cases).   The current Section 3730(h) following the 2009 amendments, however, conspicuously omits the word "employer."  Therefore, Ms. Moore's allegations that stem from conduct prior to May 2009 cannot give rise to a retaliation claim against Defendants Sherman and Clemons, but her allegations regarding post–May 2009 conduct, primarily her termination, do give rise to a retaliation claim against these Defendants.

Defendants' motion to dismiss Count Five of the Second Amended Complaint is accordingly denied in part and granted in part.

III.    Conclusion

For the reasons stated above, Defendants' motions [Doc. ## 54, 56] to dismiss the Second Amended Complaint are GRANTED in part and DENIED in part.  Counts One

through Three are dismissed, Ms. Moore has withdrawn Count Four, and Count Five remains for adjudication.



IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March, 2012.

18